UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**IN LUX RESEARCH**, *et al.*,

    Plaintiffs,

v.

**HULL MCGUIRE PC**, *et al.*,

    Defendants.

Civil Action No. 23-523 (JEB)

**MEMORANDUM OPINION**

    Plaintiffs Lindsay Olson and her Texas-based company In Lux Research produce jury-attitude studies. Defendant John D. Hull is an attorney practicing here in Washington. Their paths collided when Hull, while defending members of the Proud Boys in their January 6 criminal trial, solicited a report from Olson to support his motion to transfer the case out of D.C. Plaintiffs delivered the report, Hull failed to pay the agreed-upon $30,000, and Plaintiffs then sued Hull and his law firm Hull McGuire PC for breach of contract, copyright infringement, and fraud. This case ultimately culminated in a jury trial, and Plaintiffs obtained a $77,000 award on the contract claim alone. In the months since, both parties have filed a flurry of motions seeking various forms of post-trial relief. Each side prevails on some.

**I.**    **Background**

    Hull previously served as the defense attorney for Joseph R. Biggs, a Proud Boys leader who was convicted for his involvement in the January 6, 2021, attack on the Capitol. See United States v. Nordean, No. 21-175 (D.D.C. 2021). His criminal trial included other Proud Boys leaders charged in the same indictment and their respective attorneys. According to Hull, in the

1

months leading up to the trial, the defendants had hoped to transfer the case out of D.C., where they feared jurors would not be terribly sympathetic. See ECF No. 147 (Trial Trans. Day 1) at 80–81. After seeing the jury-attitude report Olson had created for another January 6 trial, Hull contacted her and asked her to produce an updated community-attitudes analysis of this city and several other jurisdictions. Id. at 86–88. His plan, he explained, was to use the report to argue that D.C. juries were too biased against January 6 defendants and to ask Judge Timothy Kelly to transfer the case to a different venue. Id. at 80–81.

    The parties negotiated a price of $30,000 for the report, which Hull informally indicated would be paid by all of the Proud Boys defense attorneys, not just him. Id. at 209, 222. Olson sent a finalized invoice to Hull on September 23, 2022, which indicated that payment was due upon receipt. Id. at 102. Although Hull failed to pay then, Olson still delivered the report in October 2022, and Hull promptly filed it on the docket. Id. at 161–62; Nordean, No. 21-175, ECF No. 477-1 (In Lux Research Rep.) (D.D.C. Oct. 10, 2022). He never paid for the report afterward, however, and after a few failed attempts to secure payment, Olson and her company In Lux Research brought this suit against him and the other defense attorneys. See ECF No. 1 (Compl.) at 2–4. The claims against the other Defendants were all eventually dismissed via settlement and motions to dismiss, see ECF Nos. 60 (Order Granting Mots. to Dismiss) at 1; 96 (Stip. Dismissal) at 1, until only Hull and his firm remained. See ECF No. 97 (Not. of Appear.) at 1. This case then progressed all the way to a jury trial in January 2025 on Plaintiffs' three claims: copyright infringement, breach of contract, and fraud. See Trial Trans. Day 1 at 20, 45.

    The trial lasted a day and a half, during which the jury heard from only two witnesses: Olson and Hull. In her testimony, Olson explained that although she had agreed to produce the report for $30,000, it was really worth closer to $82,000. Id. at 184. The reason she agreed to

$30,000, she testified, was because she had secured a discounted subscription rate for the study data from her vendor and expected to be able to use the data for future studies. Id. at 184–85, 194. She also testified that Defendants' nonpayment rendered her unable to pay her subscription plan, and she subsequently lost access to that data, worth around $50,000 in her estimation. Id. at 222–23. Olson also noted that it was now too late to buy the discounted data again because that specific data was only usable up through 2024. Id. at 194. The jury ultimately found for Plaintiffs on their breach-of-contract claim and awarded $77,000 in damages but rejected their fraud and copyright-infringement claims. See ECF No. 157 (Opp. Mot. to Amend Jmt.) at 1–2.

In a case one would have expected to settle long ago, the parties have now filed myriad post-trial motions. Although the number of pleadings is dizzying, the upshot is simple: Defendants want to pay less, and Plaintiffs want to be paid more. Defendants have moved to reduce the jury award or, in the alternative, for a new trial on damages, and they have also moved for attorney fees under the Copyright Act and 17 U.S.C. § 1927. See ECF Nos. 152 (Defs. Mot. to Alter J.); 145 (Defs. Mot. Att'y Fees); 149 (Opp. to Pls. Mots. for Fees, Cost, and Interest). Plaintiffs have filed a bill of costs, a Motion for Attorney Fees under Texas Civil Practices and Remedy Code § 38.001, and a Motion for Pre-Judgment and Post-Judgment Interest under Texas law and 28 U.S.C. § 1961(a). See ECF Nos. 143 (Bill of Costs); 144 (Pls. Mot. for Interest); 145 (Pls. Mot. Att'y Fees). The Court will address each Motion in turn.

**II.    Analysis**

    A.    Defendants' Motion to Reduce Jury Award

Defendants seek to reduce the jury-awarded damages, arguing that $77,000 is an inappropriate sum for the breach of a $30,000 contract. See Defs. Mot. to Alter Jmt. at 1. They move for remittitur under Rule 59(e), a new trial under Rule 59(a), or, in the alternative, for

judgment as a matter of law under Rule 50(a), repeating largely that same argument. Id. The Court finds that because the record evidence cannot support the jury's award of $77,000, remittitur under Rule 59(e) is the appropriate outcome.

1. *Legal Standard*

Rule 59(e) imposes an exacting standard for altering a jury verdict. Such a motion "need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (internal quotation marks omitted). More specifically, in the context of remittitur, reduction of a jury award under Rule 59(e) is appropriate when: (1) "the verdict is 'beyond all reason, or . . . is so great as to shock the conscience'" or (2) "the verdict 'is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.'" Webb v. Hyman, 861 F. Supp. 1094, 1113 (D.D.C. 1994) (quoting Jeffries v. Potomac Dev. Corp., 822 F. 2d 87, 96 (D.C. Cir. 1987)). "Courts may not set aside a verdict merely because the judge would have awarded a different amount . . . ." Jean-Baptiste v. District of Columbia, 931 F. Supp. 2d 1, 13 (D.D.C. 2013).

Although trial courts typically cannot reduce compensatory-damage awards without first offering plaintiffs a choice between consenting to the reduction or a new trial, there is an exception when "a jury's assessment of damages includes an impermissible component that can be identified and calculated with precision." Carter v. District of Columbia, 795 F.2d 116, 135 (D.C. Cir. 1986); accord In re Lorazepam & Clorazepate Antitrust Litig., 261 F. Supp. 3d 14, 17 (D.D.C. 2017). Thus, when "it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there," Carter, 795 F.2d at 134 (quoting 11 Charles

4

Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2815, at 159 (2d ed. 1995)), a trial court may reduce a jury award.

        2.    *Discussion*

Defendants argue that the jury had no legal basis for awarding Plaintiffs "a penny more" than the $30,000 promised in the contract. See Defs. Mot. to Alter Jmt. at 7. A court "need not — and indeed cannot — reconstruct the precise mathematical formula that the jury adopted." Carter v. Duncan-Huggins, Ltd., 727 F.2d 1225, 1239 (D.C. Cir. 1984). But there must be some discernable legal and factual basis for the award, and the Court cannot find one here. It will consequently reduce the damages award to $30,000.

At the outset, the parties dispute what law governs the contract. Defendants claim that D.C. law controls, see Defs. Mot. to Alter Jmt. at 2–3, while Plaintiffs argue in other Motions that Texas law applies to the contract. See Pls. Mot. Att'y Fees at 13. For the purposes of this Motion, the Court need not resolve this choice-of-law question because the two jurisdictions do not conflict. Under either D.C. or Texas law, damages may include any foreseeable injuries resulting from the breach of contract. Morfessis v. Sterling Metalware Co., 193 A.2d 66, 67 (D.C. 1963) ("[A] defendant is liable for such damages as are the natural consequence and proximate result of his conduct or which reasonably may be supposed to have been within the contemplation of the parties at the time the contract was made as the probable result of a breach of it."); Signature Indus. Servs., LLC v. Int'l Paper Co., 638 S.W.3d 179, 186 (Tex. 2022) (holding that contract damages may "compensate the plaintiff for foreseeable losses that were caused by the breach but were not a necessary consequence of it"). To recover consequential damages, a plaintiff must prove that those damages were foreseeable and prove their extent to a degree of "reasonable certainty." Signature Indus. Servs., 638 S.W.3d at 186 (quoting Phillips v.

Carlton Energy Grp., LLC, 475 S.W.3d 265, 278 (Tex. 2015)); accord Mark Keshishian & Sons, Inc. v. Washington Square, Inc., 414 A.2d 834, 842 (D.C. 1980) (same).

Plaintiffs argue that the $77,000 verdict constitutes the sum of the unpaid $30,000 and the $50,000 worth of data that they lost access to as a result of Defendants' nonpayment. See ECF No. 157 (Pls. Opp. to Defs. Mot. to Alter Jmt.) at 9. According to them, part of the reason Olson agreed to sell the study for $30,000 — less than it was worth — was because she anticipated getting access to around $50,000 worth of data in addition to the payment. Id. Olson explained at trial that she had secured discounted subscription access to valuable data, in part to perform Hull's study, and that she expected to be able to keep using the data afterward. She thus viewed the value of that data ($50,000) as part of the bargain struck with Defendants. See Trial Trans. Day 1 at 184–87, 194. The jury, Plaintiffs argue, thus properly awarded them the combination of the $30,000 Olson was owed and the $50,000 of data she lost. See Pls. Opp. to Defs. Mot. to Alter Jmt. at 9.

The math does not add up. To begin, $30,000 plus $50,000 does not equal $77,000. In any event, it makes no sense to add the two numbers. Plaintiffs maintain that Olson lost $50,000 worth of data because Defendants' nonpayment decimated her ability to pay her subscription fees. But Olson did not lose the data; she was simply unable to pay for it. In other words, Olson would have had to use the $30,000 to buy the data-subscription plan, so the $30,000 and the $50,000 worth of data overlap in value — the former would be traded for the latter. An analogy may help. Imagine Olson and Hull have a contract where Hull will pay Olson $100. Olson is saving up for a $500 bike and is relying on Hull's $100 to pay for it. If Hull fails to pay and Olson then cannot make her purchase, Hull would not be liable for both the $100 and the $500

6

value of the bike. So, too, here. Defendants are not liable to Plaintiffs for both their $30,000 payment and the $50,000 value of what Plaintiffs would have purchased with that payment.

To be clear, Plaintiffs did suffer a loss when Defendants' nonpayment rendered them unable to purchase their data subscription. But what they lost was the opportunity to purchase the data at a discounted rate, not the data itself. To continue with the earlier analogy, imagine Olson was relying on Hull's $100 payment to purchase a discounted bike, valued at $500, but being sold for just $300 in a one-week sale. Say Hull does not pay, and the sale expires. As explained above, Hull would not be liable for the $500 value of the bike, or even the $300 purchase price of the bike. He might, however, be liable for the $200 discount that Olson could not take advantage of, if that was the only opportunity she had to buy the bike for such a big discount, and his nonpayment caused her to lose out. Yet Hull would be liable only if he <u>knew</u> or <u>should have been aware</u> that Olson was relying on his payment to take advantage of the limited-time discount — in other words, if the consequence of his nonpayment was <u>foreseeable</u>.

Returning to the facts of this case, although loss of opportunity is a viable theory of damages, Olson never testified that the loss of her discount was foreseeable or known to Hull when they formed the contract. "Consequential damages are not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach." <u>Signature Indus. Servs.</u>, 638 S.W.3d at 186 (cleaned up) (quoting <u>Stuart v. Bayless</u>, 964 S.W.2d 920, 921 (Tex. 1998)); <u>accord</u> <u>Morfessis</u>, 193 A.2d at 68. Olson testified that Hull knew she needed his payment "to satisfy [her] obligations" to the data vendor, <u>see</u> Trial Trans. Day 1 at 223, but she never stated that Hull contemplated or should have contemplated, at the time of their contracting, that she was relying on his payment to take advantage of a rare opportunity for discounted data. All she shared with him was that she "would get the data, and

7

[she] found a cheaper way to do it, so [she] could [produce his report] for [$]30,000." Id. at 192. Foreseeability — or more accurately, the lack of it — thus shuts the door on consequential damages here.

In any event, two more mathematical difficulties plague this explanation of $77,000. Olson testified that the discount price she secured was $46,000, id. at 193, and that the data was worth $50,000, id. at 222, which would make the discount worth only $4,000. If she could have proven foreseeability, then Plaintiffs could be owed only $4,000 for the loss of discount, leaving $43,000 of their awarded damages unaccounted for. At other times, Olson framed the discount as much more substantial — $46,000 for data that would have otherwise cost "hundreds of thousands of dollars." Id. at 177. That valuation of the discount is far too vague to serve as a basis for damages. Without concrete information on how much the subscription originally cost, the jury could not have meaningfully valued the loss of the discount opportunity to add it to Plaintiffs' damages. Damages need not be perfectly precise, but they cannot be conjured up "on the basis of mere speculation or guesswork" either. CapitalKeys, LLC v. Democratic Republic of Congo, 278 F. Supp. 3d 265, 285 (D.D.C. 2017) (quoting Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003)); accord Prappas v. Entezami, 2009 WL 331898, at *3 (Tex. App. Feb. 11, 2009) ("There can be no recovery for damages which are speculative or conjectural."). For all these reasons, loss of opportunity could not have been the basis for the jury's verdict.

Unfortunately for Plaintiffs, other theories for how the jury arrived at $77,000 fare no better. Olson testified at trial that her study was worth $82,000, even if she only charged $30,000 for it. See Trial Trans. Day 1 at 184. If the jury relied on this testimony to award damages, it was wrong to do so. Contract damages are determined by the injured party's expectations; breach does not suddenly entitle Plaintiffs to recover more from Defendants than

Olson originally agreed to accept as payment, even if the service Plaintiffs sold was worth more than the contract price. See 3 E. Farnsworth, Contracts § 12.8, at 188 (2d ed. 1998) ("The basic principle for the measurement of those damages is that of compensation based on the injured party's expectation."). Plaintiffs' best explanation for the additional $47,000 would have been as lost profits and business associated with the loss of the data, but they explicitly disavow such a theory of damages in their briefs. See Pls. Opp. to Defs. Mot. to Alter Jmt. at 10.

The Court is therefore left with no plausible legal explanation for the jury award of $77,000. While the law allows for consequential damages, none were sufficiently proven here. Based on the evidence presented at trial, there was no legal basis for the jury to exceed the contract price in awarding breach-of-contract damages. For this reason, the Court will reduce Plaintiffs' award to $30,000, in addition to pre-judgment and post-judgment interest as detailed below.

        B.        Plaintiffs' Motion for Attorney Fees

Next, Plaintiffs move for attorney fees under Rule 54 and Texas Civil Practice and Remedy Code § 38.001(b)(1). See Pls. Mot. Att'y Fees at 1. When fees are requested, the "applicant bears the burden of establishing entitlement to an award." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). While Plaintiffs concede that the contract does not have a fee-shifting provision, they point out that under Texas law, courts must grant fees to prevailing plaintiffs in breach-of-contract suits whether or not the contract expressly awards them. See Pls. Mot. Att'y Fees at 5–6 (citing Tex. Civ. Prac. & Rem. Code § 38.001(b)(1)) ("A person may recover reasonable attorney[] fees from an individual . . . if the claim is for . . . rendered services."). Therefore, they claim, fees must be awarded here. The Court disagrees.

"In diversity cases, attorney[] fees are considered substantive and are controlled by state law." United States v. One Parcel of Prop. Located at 414 Kings Highway, 1999 WL 301704, at *4 (D.D.C. May 11, 1999). Because Plaintiffs' claimed entitlement to fees is grounded in their breach-of-contract claim, the law governing the contract will also determine what law governs the fees dispute. Despite taking this case all the way through trial, the parties surprisingly have yet to hash out whether the contract and accompanying questions of recovery are governed by Texas or D.C. law. In their post-trial briefs, Plaintiffs contend that Texas law governs, see Pls. Mot. Att'y Fees at 3, whereas Defendants argue for the application of D.C. law. See Opp. to Pls. Mots. for Fees, Cost, and Interest at 3. Unlike with contract damages, the Court finds that the two jurisdictions provide conflicting guidance here: while fees are mandatory under Texas state law, Ventling v. Johnson, 466 S.W.3d 143, 154 (Tex. 2015), D.C. follows the American Rule of not shifting fees unless a contract, statute, or set of extenuating circumstances provides otherwise. Malik Corp. v. Tenacity Grp., LLC, 961 A.2d 1057, 1063 (D.C. 2008). A choice-of-law analysis is thus necessary to determine which law applies.

"A federal court must apply the choice-of-law rules of the jurisdiction in which it sits to determine the body of law that should govern substantive matters." Turkmani v. Republic of Bolivia, 273 F. Supp. 2d 45, 51 (D.D.C. 2002). When the parties have not contractually specified governing law, "the District of Columbia employs a constructive blending of the governmental interest analysis and the most significant relationship test, the latter as expressed in the Restatement (Second) of Conflicts of Law § 188 (1988)," to determine what law applies. Bode & Grenier, LLP v. Knight, 808 F.3d 852, 864 (D.C. Cir. 2015) (cleaned up). This analysis considers five main factors: "[1] the place of contracting, [2] the place of negotiation of the contract, [3] the place of performance, [4] the location of the subject matter of the contract, and

10

[5] the domicil[e,] . . . place of incorporation and place of business of the parties." Id. (quoting Restatement (Second) of Conflicts of Laws § 188(2)(a)-(e) (1988)). In the case of service contracts, "the Restatement assigns presumptive weight to the place where the services are to be rendered[,] . . . and no factor matters more than the place of performance." Id.

Place of contracting, negotiation, and domicile are all neutral: the parties negotiated and contracted over the internet, and Plaintiffs and Defendants hail from Texas and D.C., respectively. And although place of performance holds great weight for choice of law for service contracts, that factor is ultimately also neutral in this case.

Plaintiffs argue that because they produced the survey in Texas and Defendants would have sent payment back to Texas, the contract was fully performed in Texas and thus its laws govern. See Pls. Mot. Att'y Fees at 7–8. But this framing of performance is rather imprecise. While it is true that Defendants would have performed in Texas by sending money there, cf. Samra v. Shaheen Bus. & Inv. Grp., Inc., 355 F. Supp. 2d 483, 500 n.13 (D.D.C. 2005) (describing established contract principle that contractual "obligation to pay money is not discharged until the payee actually receives the money"), that same logic means Plaintiffs did not perform until they sent the report to Defendants here in D.C. After all, if Plaintiffs had produced the report and failed to deliver it to Defendants, they would have been liable for breach, even though the report existed. This renders place of performance neutral: Defendants would have performed in Texas, but Plaintiffs themselves would have performed in D.C.

That leaves the subject matter of the contract as the determining factor. The Court finds it weighs in favor of applying D.C. law. Consider the substance of what Plaintiffs were hired to do: study D.C. jurors and create a report that could be used in a D.C. criminal trial. Cf. Chicago Ins. Co. v. Paulson & Nace, PLLC, 37 F. Supp. 3d 281, 291 (D.D.C. 2014), aff'd, 783 F.3d 897

11

(D.C. Cir. 2015) (finding that "subject matter" of malpractice-insurance contract being legal practice in Washington weighed in favor of applying D.C. law). Plaintiffs conducted email, text, and phone-call surveys of residents in D.C. and three other jurisdictions, all for the purpose of comparing the attitudes of D.C. jurors to non-D.C. jurors to draw conclusions about potential biases within this city. See ECF No. 1-3, Exh. C (Report) at 1. In sum, this city was the focus of the report, a significant data source for it, and the locus of the court in which it was docketed.

A governmental-interest analysis does not change this calculus because the Lone Star State has no especially strong interest in the contract that outweighs D.C.'s interest. Plaintiffs were domiciled in Texas, but Defendants hailed from Washington. Plaintiffs worked from Texas but produced a report about D.C. jurors intended to affect litigation in D.C. The Court thus concludes that D.C. law governs the contract.

This conclusion is also in harmony with the specific context in which Plaintiffs seek to apply Texas law: their attorney-fee Motion. Although Plaintiffs' right to fees would arise from their contract, and thus the choice of law for the contract determines the choice of law for the fees dispute, the heart of the fees dispute is really the litigation. What happened over the course of the lawsuit determines the availability, amount, and reasonableness of fees. And that litigation occurred entirely here in D.C.

Our city has long "follow[ed] the 'American Rule' with respect to attorney[] fees," presuming that each party is responsible for its own fees absent a specific contractual provision or statute directing otherwise. Malik, 961 A.2d at 1063. Because the parties never contractually agreed to fee shifting, and because Plaintiffs concede that D.C. law does not warrant fee shifting here, see Pls. Mot. Att'y Fees at 6, the Court will deny Plaintiffs' Motion for Fees.

    C.    <u>Defendants' Motions for Attorney Fees</u>

Not to be outdone, Defendants swiftly followed Plaintiffs' Motion for Fees with their own. They argue that under the Copyright Act, they are entitled to fees as the prevailing party on the copyright-infringement claim. See Defs. Mot. Att'y Fees at 1. Defendants separately contend that they are entitled to the fees and costs of post-trial motion litigation under § 1927. See Opp. to Pls. Mots. for Fees, Cost, and Interest at 3. The Court will deny both Motions.

    1.    *Section 505*

Under 17 U.S.C. § 505, courts "may" award reasonable attorney fees to a "prevailing party" in a copyright-infringement claim. Defendants argue that because the jury rejected Plaintiffs' claim, they are the prevailing party and thus may be granted fees. See Defs. Mot. Att'y Fees at 2; ECF No. 156 (Rep. to Opp. to Pls. Mot. for Fees) at 7. "May" is the operative term here. See Kirtsaeng v. John Wiley & Sons, Inc., 579 U.S. 197, 202 (2016) (finding that § 505 "clearly connotes discretion" for district court) (quoting Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994)). Even if Defendants were the prevailing party on the copyright claim, the Court will not exercise its discretion to grant fees here. Under the totality of circumstances, including the good-faith basis of that claim and the fact that Plaintiffs actually obtained damages from the jury, it ultimately makes little sense to grant Defendants fees under § 505.

    2.    *Section 1927*

Title 17 U.S.C. § 1927 allows courts to sanction attorneys who "multipl[y] the proceedings in any case unreasonably and vexatiously" by requiring them to pay the fees and costs associated with any unnecessary litigation. Defendants argue that Plaintiffs' numerous post-trial motions rise to this standard and ask that Defendants' fees for the litigation of these matters be compensated under § 1927. See Opp. to Pls. Mots. for Fees, Cost, and Interest at 3. While the Court certainly agrees that the proceedings here have been excessive, it declines to

13

find Plaintiffs' filing of post-trial motions for costs and fees to be so unreasonable or vexatious as to warrant sanctions. The fees of this litigation will lie where they are.

        D.        <u>Plaintiffs' Motion for Pre-Judgment and Post-Judgment Interest</u>

Plaintiffs also move for pre-judgment and post-judgment interest. Prevailing plaintiffs in breach-of-contract suits may seek both forms of interest on their awarded damages. "The former runs from the time the claim accrues until judgment is entered, while the latter runs from the date of the entry of judgment until payment by the defendant." <u>Paige Int'l, Inc. v. XL Specialty Ins. Co.</u>, 267 F. Supp. 3d 205, 210 (D.D.C. 2017) (citations and internal quotation marks omitted). The Court will grant both.

        1.        *Pre-Judgment Interest*

In diversity cases, pre-judgment interest is typically governed by "the law of the jurisdiction creating the underlying cause of action." <u>Winder v. District of Columbia</u>, 555 F. Supp. 2d 103, 112 (D.D.C. 2008), <u>aff'd sub nom.</u> <u>Winder v. Erste</u>, 566 F.3d 209 (D.C. Cir. 2009). As discussed above, the Court applies D.C. law to the contract.

For breach-of-contract claims, D.C. Code § 15-108 mandates pre-judgment interest where "(1) the action is one to recover a liquidated debt, and (2) interest is payable on that debt by contract or by law or usage." <u>Steuart Inv. Co. v. The Meyer Group, Ltd.</u>, 61 A.3d 1227, 1239 (D.C. 2013) (quoting <u>District Cablevision Ltd. P'ship v. Bassin</u>, 828 A.2d 714, 731 (D.C. 2003)). D.C. courts have instructed that such statutes "should be generously construed" to achieve their remedial purpose. <u>District Cablevision</u>, 828 A.2d at 732. Unless specified by contract, pre-judgment interest under § 15-108 accrues at a non-compounding rate of 6% per year, from the day the debt is due until judgment is entered. <u>Klayman v. Jud. Watch, Inc.</u>, 2019 WL 1244079,

at *29 (D.D.C. Mar. 18, 2019), aff'd, 6 F.4th 1301 (D.C. Cir. 2021) (citing D.C. Code § 28-3302(a)).

Plaintiffs satisfy both requirements for pre-judgment interest under § 15-108. First, their breach-of-contract claim sought to recover a liquidated debt. "A liquidated debt is one which at the time it arose . . . was an easily ascertainable sum certain." Aon Risk Servs., Inc. v. Estate of Coyne, 915 A.2d 370, 379 (D.C. 2007) (quoting District of Columbia v. Pierce Assocs., Inc., 527 A.2d 306, 311 (D.C. 1987)) (internal quotation marks omitted). Breach-of-contract claims seeking the contract price fall into this category because it is obvious at the time of breach how much is owed. Giant Food, Inc. v. Jack I. Bender & Sons, 399 A.2d 1293, 1299 (D.C. 1979). Although the jury originally awarded more, see Pls. Mot. for Interest at 6, the Court has since adjusted Plaintiffs' damages award to the contract price of $30,000, "an easily ascertainable sum certain" known to both parties at the time of breach. Aon Risk Servs., 915 A.2d at 379. The Court, accordingly, finds this action to be one for liquidated debt. Further, "[u]nder District of Columbia law, 'it is indeed customary to pay interest on funds that are withheld and not paid when due,'" so the interest here is "payable by . . . usage," to borrow the statute's term of art. Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Hotelco, C.A., 342 F. Supp. 3d 1, 24 (D.D.C. 2018) (quoting Bragdon v. Twenty-Five Twelve Assocs. Ltd. P'ship, 856 A.2d 1165, 1172 (D.C. 2004)). An award of pre-judgment interest is thus appropriate under D.C. Code § 15-108. The Court will award 6% interest from September 23, 2022, the day payment was due to Plaintiffs, until February 9, 2025, the day before the Clerk entered the Judgment in this case. Using the Court's adjusted damages award of $30,000, the resulting pre-judgment interest award will be $4,290.41.

2. *Post-Judgment Interest*

Post-judgment interest, conversely, is governed by federal law in district court, even for diversity cases. Inova Health Care Servs. for Inova Fairfax Hosp. & Its Dep't, Life With Cancer v. Omni Shoreham Corp., 2024 WL 5158796, at *17 (D.D.C. Dec. 18, 2024). Under federal law, post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). The applicable interest rate is set by "the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). "Because '[a]pplication of section 1961(a) is mandatory, not discretionary,'" Taitt v. Islamic Republic of Iran, 664 F. Supp. 3d 63, 114 (D.D.C. 2023) (citation omitted), the Court awards Plaintiffs the statutory rate of 4.20%. See Daily Treasury Par Yield Curve Rates, U.S. Department of the Treasury, https://perma.cc/BLS9-XXZG (applying statutory rate set week before February 10, 2025, date of judgment). This interest will accrue on the damages award as well as pre-judgment interest, Lagstein v. Certain Underwriters at Lloyd's of London, 725 F.3d 1050, 1056 (9th Cir. 2013), from the date of judgment until the date of payment, compounding annually. See 28 U.S.C. § 1961(b).

E. Plaintiffs' Bill of Costs

Last up is Plaintiffs' Bill of Costs. Plaintiffs have agreed to waive $150 in service costs, leaving a remaining bill of $2,360.13. See ECF No. 154 (Pls. Rep. to Opp. to Bill of Costs) at 4. Defendants' principal objection is that Plaintiffs should not have included the costs of Hull's deposition transcript, which cost around $1,900. See Opp. to Pls. Mots. for Fees, Cost, and Interest at 4. But the Court cannot say that deposing a defendant is an unreasonable step in litigation. Honoring the "venerable presumption [established under Rule 54(d)(1)] that

prevailing parties are entitled to costs," Scott v. Washington Metro. Area Transit Auth., 2025 WL 1561707, at *1 (D.D.C. June 3, 2025), the Court will grant Plaintiffs' revised bill of costs.

### III. Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion to Alter Judgment, Plaintiffs' Motion for Pre-Judgment and Post-Judgment Interest, and Plaintiffs' Bill of Costs. It will deny both parties' Motions for Attorney Fees. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: September 19, 2025